UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
APOTHECO PHARMACY DURHAM LLC, and
APOTHECO, LLC,
                              Petitioners,
    -against-
HASSAN AHMED,
                              Respondent.
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 06/10/2024

24-CV-03619 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Petitioners Apotheco Pharmacy Durham LLC and Apotheco, LLC (together, "Apotheco") move before this Court for a Temporary Restraining Order and a Preliminary Injunction (the "TRO/PI Motion") against Respondent Hassan Ahmed ("Ahmed") that would, among other relief sought, effectively shut down all operations of Ahmed's business, Evienne, LLC d/b/a Ebers Pharmacy ("Ebers Pharmacy"). For the reasons set forth below, the Court GRANTS Apotheco's request to order Ahmed to return or destroy all Apotheco property in his, his wife's, or his business' possession; however, the balance of Apotheco's TRO/PI Motion is hereby DENIED.

I. BACKGROUND

   A. Factual Background

Many of the key facts underlying this matter are essentially undisputed. Apotheco is a retail pharmacy business that operates pharmacies focused on dermatology prescriptions, with over 30 physical locations in at least 19 states, and customers in at least a dozen additional states through mail-order service. *See* Declaration of Hassan Ahmed (the "Ahmed Decl.") ¶ 62;

1

Hearing Testimony of Natasha Hennessey.[1]  Ahmed is a 34-year-old immigrant from Egypt with a pending asylum application and the accompanying temporary work permit, who was educated in Egypt but is a licensed pharmacist in the United States.  *See* Ahmed Decl. ¶¶ 1–6, 31.  After receiving his pharmacy license in New Jersey in 2017, Ahmed worked as a staff pharmacist at an Apotheco pharmacy in Princeton, New Jersey.  *Id*. ¶ 8; Dkt. No. 1, Apotheco Verified Petition for Injunction ("Petition") ¶ 26.  In January 2022, Ahmed passed the pharmacy licensing exam in North Carolina and became licensed to dispense prescriptions in North Carolina, in anticipation of a potential promotion at a new Apotheco location.  *See* Ahmed Decl. ¶ 24.  In February 2022, Ahmed was offered a promotion to Pharmacist in Charge ("PIC") of a new Apotheco location in Durham, North Carolina, which he accepted.  *See* Petition ¶ 27.  He opened the Durham location as its PIC in late February 2022.  *Id*.; Ahmed Decl. ¶ 26.  As PIC of the Durham location, Ahmed was essentially the store manager, responsible for a variety of pharmacological and managerial functions to ensure effective operation of the pharmacy as both a medical provider and a business.  *See* Petition ¶ 29.  In conjunction with the promotion, Ahmed was required to sign a "Restrictive Covenant Agreement" (the "Agreement"), which was a form contract that Apotheco required of all PICs at Apotheco locations.  *Id*. ¶ 28; Ahmed Decl. ¶ 25.  Ahmed signed the Agreement three days after it was presented to him along with his promotion offer letter.  *Id*. ¶ 28.  The Agreement required, among other things, that Ahmed would protect a defined set of Apotheco's Confidential Information as well as confidential Third-Party Information, would use that information only to benefit Apotheco and would maintain it as confidential, and would not have any involvement in a business primarily providing dermatological pharmacy products or

---

[1] At the time of the issuance of this Opinion and Order, the transcript for the Hearing is not available.  In the interest of a prompt resolution of the TRO/PI Motion, references to testimony provided at the Hearing herein are provided in general terms without citation.

services in any state where Apotheco operates for a period of two years after the end of his employment with Apotheco. *See* Petition ¶¶ 37–61; *see also* Agreement §§ 1, 2, 3, 8.

In March 2023, Ahmed's wife registered Evienne LLC with the State of North Carolina. *See* Petition ¶ 63. In November 2023, Ahmed's wife registered Ebers Pharmacy as an operating business name for Evienne LLC and represented that Ebers Pharmacy would engage in the "pharmacy business." *Id*. ¶¶ 63–64. In December 2023, Ebers Pharmacy obtained a license from the North Carolina Board of Pharmacy, with a business address in Greensboro, North Carolina, and identified Ahmed as the pharmacy manager. *Id*. ¶¶ 66–67. Ahmed resigned from Apotheco without notice on March 18, 2024. *Id*. ¶ 31. Ebers Pharmacy became operational shortly thereafter. *See* Ahmed Decl. ¶ 74. At least some of Ebers Pharmacy's marketing materials identify its services as specializing in dermatology. *See* Petition ¶¶ 73–74. Between May 2023 and his resignation in March 2024, Ahmed forwarded over 200 Apotheco documents from his work email to his personal email, including, for example, training manuals, price lists, internal sales reports, emails documenting various Apotheco business processes (such as how to enter manufacturer coupons into its point-of-sale systems), spreadsheets containing detailed information about Apotheco providers and patients, and documents detailing Apotheco's interactions with various pharmacy benefit managers. *Id*. ¶¶ 77–79. Ahmed is currently the sole pharmacist at Ebers Pharmacy, which is located in an office building on the outskirts of Greensboro, North Carolina. *See* Ahmed Decl. ¶ 67.

### B. Procedural History

On May 10, 2024, Apotheco initiated this action by Verified Petition for Injunction. *See* Dkt. No. 1. Concurrent with the filing of the Petition, Apotheco moved by Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction with Emergency Relief pursuant

3

to Federal Rule of Civil Procedure 65 seeking to enjoin Ahmed from taking actions that violate the Agreement and from using Apotheco's trade secrets in violation of law.  *See* Dkt. Nos. 5–9 ("Mot.").

Specifically, the proposed TRO/PI Apotheco submitted to the Court included language seeking to enjoin Ahmed from:

> (1) "using, disclosing, accessing, transferring, copying, or printing any of Apotheco's confidential, proprietary, or trade secret information, or other Apotheco documents;"
>
> (2) "engaging in […] the management, operation, or ownership of Ebers Pharmacy or other pharmacy that primarily provides dermatological products and services, in the area in which Apotheco conducts business, including the State of North Carolina;"
>
> (3) "directly or indirectly (including through others) from soliciting or interfering with Apotheco's business relationship with, or attempting to solicit or interfere with Apotheco's business relationship with," Apotheco's customers, physician referral sources, or Apotheco employees; and
>
> (4) taking any actions further violating the Agreement.

*See* Dkt. No. 5 (the "Proposed TRO/PI").  The Proposed TRO/PI also included language requesting the Court order Ahmed to:

> (5) "return to Apotheco […] all of Apotheco's tangible property and all of Apotheco's tangible or hard copy confidential, proprietary, and/or trade secret information, and all other tangible or hard copy Apotheco documents;" and
>
> (6) provide Ahmed's personal devices and accounts to a third-party forensic vendor for an examination to "determine the extent to which Apotheco's confidential, proprietary, and/or trade secret information and other Apotheco documents, including the

>Misappropriated Apotheco Information, has been used, disclosed, or otherwise misappropriated; and to remediate and permanently delete Apotheco's confidential, proprietary, and trade secret information and other Apotheco documents […] from such devices and accounts."

*Id*.

The Court issued an Order to Show Cause on May 13, 2024 (the "OSC"), setting forth a briefing schedule for the TRO/PI Motion, ordering Apotheco to confirm service of the TRO/PI supporting papers, and scheduling a Show Cause Hearing (the "Hearing"). *See* Dkt. No. 15. The OSC did not temporarily restrain Ahmed in advance of the Hearing, but set a schedule with expedited deadlines. After a brief adjournment of the deadlines, *see* Dkt. No. 23, Ahmed ultimately opposed the TRO/PI Motion on May 27, 2024, Apotheco replied on May 30, 2024, and the Hearing was held via videoconference on May 31, 2024. *See* Dkt. No. 29; May 31, 2024 Minute Entry.

At the Hearing, which lasted approximately six hours, Apotheco called Natasha Hennessy, Apotheco's CEO, as a witness. Ahmed, acting *pro se*, called himself as a witness. Both parties were afforded the opportunity to make opening and closing statements and to cross-examine the others' witness. At the conclusion of the Hearing, the Court reserved decision and informed the parties that a written Order would soon follow.

## II.   DISCUSSION

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (internal quotation marks omitted). To obtain preliminary injunctive relief, a party must show: "(1) a likelihood of success on the merits . . .; (2) a likelihood of irreparable injury in the absence of an injunction;

5

(3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotation marks omitted). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River*, 481 F.3d at 66 (internal quotation marks omitted). Additionally, courts must consider "the balance of hardships between the plaintiff and defendant and issue the injunction *only* if the balance of hardships tips in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (emphasis added).

Failure to demonstrate any of the above factors is fatal to the request for relief. *See Victorio v. Sammy's Fishbox Realty Co., LLC*, No. 14 Civ. 8678(CM), 2014 WL 7180220, at *4 (S.D.N.Y. Dec. 12, 2014). "When considering a motion for a preliminary injunction, unlike a motion to dismiss, the Court need not accept as true the well-pleaded allegations in Plaintiff['s] complaint." *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020). Each party seeking the injunction carries the burden of persuasion and must demonstrate "*by a clear showing*" that the necessary elements are satisfied. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original).

### A. Likelihood of Success on the Merits

The Court finds that it is likely that Apotheco will prevail on at least one of its claims against Ahmed. It is essentially undisputed between the parties that Ahmed violated the

confidentiality provisions of the Agreement.[2]  The Agreement required Ahmed to refrain from using or disclosing any confidential information or work product of Apotheco, except on Apotheco's behalf, and that he would return all Apotheco confidential information (whether hard copy or electronic), work product, and property, at the time of his separation or at any time upon request.  *See* Ex. 1, Dkt. No. 1–1 ("Agreement") §§ 1, 2 (the "Confidentiality Provision"). Apotheco has put forward numerous examples of emails—and Ahmed has not disputed their authenticity—in which Ahmed used his Apotheco email account to send his personal email account documents that he (i) obtained during the course of his work for Apotheco, (ii) are Apotheco's property, and (iii) contained Apotheco's confidential business information.  *See, e.g.*, Hennessey Decl. ¶¶ 20-31 (identifying documents filed under seal with the Court and reviewed by the Court *in camera*).  Ahmed admitted, both on the record at the Hearing and in his Opposition to the Petition, that he sent these documents to himself, *see* Petition Opp. ¶ 25, and it is further undisputed that he has refused to comply with Apotheco's demands that he return the documents and information.

Ahmed thus does not actually dispute that he violated the Confidentiality Provision, only that the Agreement is generally unenforceable and that the documents did not constitute trade secrets.  *See* Petition Opp. ¶ 25.  But the Confidentiality Provision of the Agreement does not require the documents and information to rise to the level of "trade secrets;" the Confidentiality

---

[2] As discussed below, Ahmed has made arguments that the Agreement is unenforceable due to duress, that the documents he transferred were not trade secrets or confidential information, and that the non-compete portions of the Agreement are unenforceable as against public policy.  *See* Opp. at 8–17. However, Ahmed concedes facts which are sufficient to enable the Court to conclude that he misappropriated information that falls within the Agreement's definition of Confidential Information, and that his duress argument is unpersuasive under contract law on the present record.

7

Provision merely requires the documents or information to be "Confidential Information,"[3] which includes information "confidential" or "proprietary" to Apotheco, regardless of its status as a trade secret. The Court, having reviewed the documents in question, finds they undoubtedly constitute Confidential Information of Apotheco because, at the very least, they included business records that Apotheco kept and intended to keep confidential. Because the Court finds Ahmed's unenforceability arguments unavailing, *see* Opp. at 8–12, Apotheco is likely to succeed on its claim that Ahmed violated the Confidentiality Provision of the Agreement.[4]

### B. <u>Irreparable Harm</u>

Apotheco proffers two main arguments on how it has satisfied the element of irreparable harm: (1) that irreparable harm is automatically presumed where a party has misappropriated a trade secret; (2) that Ahmed's position as Manager of Ebers Pharmacy runs the imminent risk that he will use Apotheco's confidential information to unfairly compete, to solicit Apotheco's physician and patient contacts, and to disclose their trade secrets in the course of operating his business.

---

[3] The Agreement defines Confidential Information as "all non-public, confidential, proprietary and/or trade secret information, including, without limitation, all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, plans, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Company Group, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors." Agreement § 8(a).

[4] Finding Apotheco is likely to succeed on at least one of its claims against Ahmed, the Court does not analyze its additional claims—in contract, under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152, *et seq.*—against Ahmed for the sake of an expedited decision in this emergency matter. Even assuming Apotheco has demonstrated likelihood of success on its remaining claims, as discussed further below, the balance of the equities and the public interest counsel in favor of denying the full extent of the relief sought by the TRO/PI Motion. Because the outcome of these claims is not dispositive to the TRO/PI Motion, the Court withholds further analysis as unnecessary and unwarranted at this stage of the case.

Apotheco's first argument is legally incorrect.  As the Second Circuit has stated:

"A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge. As Judge Conner has observed, where there is no danger that a misappropriator will disseminate proprietary information, 'the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product ... [which] should be fully compensable by money damages.'"

*Faiveley Transp.*, 559 F.3d at 118–19.  Even assuming for purposes of this motion that the documents and information taken by Ahmed constitute "trade secrets," Apotheco has failed to put forward any evidence that Ahmed has imminent plans to "disseminate" those documents and the information contained within them.  In fact, the evidence Apotheco has offered to the Court are emails sent from Ahmed's Apotheco account to *himself* at his personal email account.  Such documents may constitute evidence that Ahmed has intentions to use this information for his own pecuniary gain, but they do not establish an intent to distribute the trade secrets to others or take other action to diminish their value more broadly.  Because the movant seeking a preliminary injunction must show that the harm is "imminent, not remote or speculative," the vague risk that Ahmed *could* disseminate the information if he wishes does not satisfy their burden.  *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).

Apotheco's second irreparable harm argument similarly fails due to its speculative nature. Apotheco argues that it is not possible for Ahmed to "serve in the *same* position with and as an owner of a pharmacy that directly competes with Apotheco in the *same* dermatological pharmacy products and services in the *same* North Carolina market, and not solicit Apotheco dermatologist

referral sources and patient users in that market, and not use or disclose the vast array of confidential and trade secret information he purposefully removed and retained prior to his abrupt resignation from Apotheco." *See* Mot. at 9 (emphasis in original).  Although Ebers Pharmacy is registered with the State of North Carolina and is legally permitted to conduct business anywhere in the State, it has one location that is 87.7 miles from Apotheco's Charlotte, North Carolina location, and 62.4 miles from Apotheco's Durham, North Carolina location. *See* Opp. at 16–18.  Thus, the Court agrees that it is certainly possible—in the course of Ebers Pharmacy's normal business—for Ahmed to issue prescriptions to Apotheco patients or to solicit Apotheco referral sources.  But the mere possibility of this is not sufficient for a showing of imminent irreparable harm.  Apotheco has shown little evidence that Ebers Pharmacy is the "same" as Apotheco, and **no** evidence that it has lost any business to Ahmed or is even likely to do so, nor that Ahmed intends to solicit its clients or its referral sources.  Indeed, at the Hearing, Ahmed credibly testified that he has no intention of undertaking such solicitation.[5]

Apotheco has also failed to show that monetary damages would be insufficient. *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (for an injunction to issue, the movant must show that the injury "cannot be remedied by an award of monetary damages").  For example, if Apotheco eventually proves that Ahmed misappropriated its trade secret information to solicit clients or physician referral sources, then Ahmed may owe Apotheco reasonably calculable money damages for the lost business to Apotheco as to those specific clients and referral sources, as well as any related damages under the relevant federal statutes. Due to the highly documented and regulated nature of the pharmacy market, discovery in this

---

[5] Moreover, Ahmed testified that he has only issued approximately 50 prescriptions through Ebers Pharmacy since it was opened, and the majority of them were not dermatological in nature.

10

matter would illuminate if any such solicitations have occurred as well as the nature and monetary amount of the resulting transactions. Prescription transactions with customers directly resulting from misappropriated information, which would otherwise have been filled by Apotheco, is a quintessential example of the harms money damages are intended to compensate. *See Moore v. Consol. Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir. 2005) ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.").

For these reasons, Apotheco has not shown that it will suffer irreparable harm absent the injunction that it seeks in its TRO/PI Motion.

### C. Balance of Hardships and the Public Interest

Although Apotheco's failure to show irreparable harm is dispositive, *see DeBuono*, 175 F.3d at 234, it is also clear that on the record before the Court, the balance of the equities weighs significantly in Ahmed's—not Apotheco's—favor.

As Natasha Hennessey, CEO of Apotheco, testified at the Hearing, Apotheco is a nationwide company operating in dozens of states. In 2019, a majority share of Apotheco's business was purchased for nine figures. It has incredible resources and, as Hennessey testified, it has already established itself as a significant presence in the North Carolina communities where it operates. Even assuming Ahmed did indeed constitute a genuine threat of competition against Apotheco, as to which there is little to no evidence, the Court is skeptical that enjoining him from continuing to operate Ebers Pharmacy (or even requiring Ahmed to alter its limited marketing materials) would materially impact Apotheco's market share.

On the other hand, were the Court to enjoin Ahmed as Apotheco requests, Ahmed has persuasively shown that his business would be damaged and his livelihood would be

significantly harmed.  Ahmed testified that he and his wife, Maryum Sherazi ("Sherazi"), have invested upwards of $90,000 into Ebers Pharmacy and that his wife's visa requires investment in a business in the United States.  Ahmed further testified that the business is in a fledgling state: over the last approximately two months of operation, he has filled only about 50 prescriptions, nearly all of which were due to referrals from a podiatrist located near Ebers Pharmacy.  An injunction requiring changes in Ebers Pharmacy's marketing materials at this stage or preventing Ebers Pharmacy from prescribing dermatological medications to patients would significantly damage the value of that investment and the ability of Ahmed to support himself and his family.

Furthermore, the public interest would not be served by the issuance of an injunction shutting down Ebers Pharmacy.  Ebers Pharmacy is located on the outskirts of Greensboro, North Carolina, in a part of the state where comparatively few other pharmacists are located.  The Court declines to prevent a qualified, North Carolina-licensed pharmacist from filling the prescriptions of North Carolinians at this preliminary stage of the case and on this limited record.

### III.   ORDER

Because it is undisputed between the parties that Ahmed is currently in possession of Apotheco's property in violation of the Agreement, and wherever possible, "relief should be narrowly tailored to fit specific legal violations and to avoid unnecessary burdens on lawful commercial activity," *Faiveley Transp.*, 559 F.3d at 119  (internal quotation marks omitted) (citing *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)), Ahmed is HEREBY ORDERED to:

1. Destroy or return to Apotheco all of Apotheco's property in his, Sherazi's, or Ebers Pharmacy's possession, including but not limited to all of Apotheco's confidential, proprietary, and/or trade secret information, and all other Apotheco documents or information he, Sherazi, or Ebers Pharmacy possess, including any "Misappropriated Apotheco Information"

(as the term is defined in paragraphs 76 through 80 of the Petition), and any documents or materials containing the substance of any of Apotheco's confidential, proprietary, and/or trade secret information, whether in paper or electronic form; and

      2.      By no later than five (5) business days from the date of this Order, submit to the Court and to counsel for Apotheco proof, by notarized and sworn affidavit made under penalty of perjury, that the return or destruction of Apotheco's property as Ordered herein has been completed.

Ahmed is HEREBY NOTICED that failure to comply with any of the above conditions of this Order could subject him to financial sanctions or other consequences as determined by the Court.

Dated: June 10, 2024
       New York, New York

                              SO ORDERED.

                              MARGARET M. GARNETT
                              United States District Judge